

NUMBER 13-12-00007-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**WILFRED PADILLA JR. A/K/A WILFREDO
PADILLA A/K/A WILLIE PADILLA,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                    **Appellee.**

---

**On appeal from the 197th District Court
of Cameron County, Texas.**

---

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria
Memorandum Opinion by Justice Benavides**

Appellant, Wilfred Padilla Jr. a/k/a Wilfredo Padilla a/k/a Willie Padilla ("Padilla"),

appeals his convictions for murder, *see* TEX. PENAL CODE ANN. § 19.02(b) (West 2011),

and engaging in organized criminal activity. *See id.* § 71.02 (West 2011). By five

issues, Padilla asserts that: (1) the State's accomplice-witness testimony lacks

corroboration by other evidence that tended to connect him to the murder offense, *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005); (2) the capital punishment procedural statute is unconstitutional, *see id.* art. 37.071 (West Supp. 2011); (3) he was entitled to a mistrial after the State called a witness who invoked his Fifth Amendment right against self-incrimination; (4) testimony from a confidential informant lacks corroboration, *see id.* art. 38.141 (West 2005); and (5) testimony from a correctional facility confidant lacks corroboration required by statute, *see id.* art. 38.075 (West Supp. 2011). For the reasons stated below, we affirm.

## I.   BACKGROUND

In the early morning hours of August 18, 2005, investigators unearthed Jo Ann Chavez's skeletal remains inside of a shallow, oval-shaped pit of dirt nearly two years after she went missing from a Harlingen, Texas mall. The State alleged that Jo Ann's death was the result of a hit ordered by Padilla, who served as the South Texas captain of the prison gang known as the Mexican Mafia.

### A.     Jo Ann's Life with the Mexican Mafia

Witnesses described Jo Ann as an outgoing and happy person, who got mixed up with the wrong crowd, including Padilla. Her association with Padilla and other members of the Mexican Mafia eventually led Jo Ann to Ohio in 2002, where she aided in the gang's cocaine-distribution operations. Jo Ann's mother, Maria de la Luz Castañeda, testified that sometime after Jo Ann's move to Ohio, she was worried about her daughter living in Ohio, and she expressed her concerns to Padilla. Castañeda testified that Padilla took her concerns as an insult and told her not to disrespect him because he could make "one phone call" to take care of her. Castañeda also recalled

2

one incident in which Padilla called her husband to tell him that Jo Ann was "talking too much," which was taken by the family as a threat against Jo Ann by Padilla.

Oscar Esteban Salazar, a former Mexican Mafia lieutenant[1] under Padilla, testified that Padilla began to show a disdain for Jo Ann after Jo Ann and Padilla's live-in girlfriend at the time, Angelita "Angie" Ontiveros, began to argue about which one of them was dating the "main man" of the cocaine-distribution operation in Ohio. Ontiveros, who also testified at trial, is Jo Ann's sister. Salazar stated that Padilla did not like the two of them arguing and told Jo Ann to "shut the fuck up" during one argument. Salazar recalled another incident in which Padilla ordered Salazar to fly to Ohio, pick up Jo Ann, and bring her back to the Rio Grande Valley because she was "causing tides in the water." Salazar elaborated that Padilla was referring to an incident in which Jo Ann got drunk at a party and discussed "things that [she was not] supposed to be talking about." Salazar complied with Padilla's request and brought Jo Ann back to the Rio Grande Valley from Ohio.

Ontiveros testified that upon her sister's return to Harlingen, Jo Ann appeared "malnourished" and "very skinny" and described her demeanor as "bad." Salazar testified that once Jo Ann moved back to the Valley, Padilla's contempt for Jo Ann continued to grow. Ontiveros testified that prior to Jo Ann's disappearance, she witnessed Padilla and his fellow Mexican Mafia associates meet at their home, when she overheard someone say that Jo Ann was "fucking up" or that she "fucked up," and "something had to be done." Ontiveros testified that Padilla asked her to bring a photo

---

[1] The State presented evidence that the Mexican Mafia's leadership structure is comprised of a hierarchy of president, vice president, generals, captains, lieutenants, sergeants, soldiers, prospects, and "esquinas." According to several witnesses who were familiar with the Mexican Mafia, Padilla held the rank of captain in the gang.

of Jo Ann to him that day, or took away a photo of Jo Ann from her. Padilla then showed the picture of Jo Ann to the other members of the meeting. According to Ontiveros, she told Jo Ann to stay away from Padilla and the other members because they were talking about her. Graciano "J.R." Castañeda, who was the father of Jo Ann's two children and also knew Padilla, testified that Padilla had told him prior to Jo Ann's disappearance that Jo Ann had been seen with a Texas Department of Public Safety officer in McAllen and that allegation had upset Padilla.

According to Salazar, Padilla had "constant complaints" about Jo Ann, and one incident in particular was "the straw that broke the camel's back." Salazar stated that Jo Ann attempted to set up a marijuana deal between the Mexican Mafia and a rival prison gang, the Texas Syndicate. Salazar testified that the Mexican Mafia does not deal with other prison gangs, and after that incident, Padilla told him that Jo Ann needed "to be dealt with." According to Salazar, "dealt with" meant that Jo Ann was going to be murdered.

### B. The "*Camello*" to Kill Jo Ann

Luis Carlos "Wicho" Mares, a former sergeant and enforcer for the Mexican Mafia under Padilla, also testified. Mares provided the jury with a description of the Mexican Mafia's criminal enterprises and organizational structure, including the concept of a "*camello*." According to Mares, "*camellos*" are assignments that are delegated to lower-ranking members by those with higher ranks. Typically, "*camellos*" were performed by a soldier who did not follow a previous order or "messed up." Mares and Salazar each testified that in November 2003, Padilla assigned the "*camello*" of murdering Jo Ann to Marcos Illan "Polo" Solis, a lower-level Mexican Mafia soldier who

4

was based in Ohio.[2]

According to Mares and Salazar, Padilla gave this "*camello*" to Solis because Solis owed Padilla approximately $20,000 in drug proceeds. Mares testified that Padilla did not want to kill Solis over his debt because Solis made Padilla a lot of money from drug sales in Ohio and Michigan. Instead, Padilla ordered Solis to perform this "*camello*" in exchange for wiping his debt clean. Salazar testified that Padilla also ordered that Jo Ann be buried somewhere in the Harlingen area. Padilla instructed Salazar to send Mares along with Solis to ensure that the job was completed. Mares also corroborated this fact in his testimony and stated that Padilla ordered him to kill Solis if Solis did not complete his "*camello*."

Sara Almaguer Ortega, Solis's girlfriend at the time of Jo Ann's murder, testified that she picked up Solis from the Harlingen airport after he flew in from Ohio sometime in November 2003. Ortega testified that Solis lived in Ohio at the time, while she attended college at Texas State Technical College in Harlingen. At that time, Ortega drove a Toyota Camry owned by Solis's mother. While spending time in Harlingen, Solis drove the Camry and dropped Ortega off for classes at Texas State Technical College. According to Ortega, Solis told her one morning that he was going to meet Jo Ann at the Harlingen mall.

Norma Cano, Jo Ann's friend, testified that she last spoke to Jo Ann at eight o'clock in the morning on November 17, 2003. The two friends agreed to meet later that day, after Jo Ann dropped her brother off at a job interview. Cano testified that Jo

---

[2] Mares corroborated Salazar's testimony regarding the reasons Padilla wanted Jo Ann murdered, but also insinuated that Padilla and Jo Ann had a sexual relationship and that Jo Ann threatened to disclose their relationship to her sister Ontiveros, which also upset Padilla. Mares stated that Jo Ann also "snitched" to rival gangs and the police about various drug loads that belonged to the Mexican Mafia.

Ann never showed up as agreed, so Cano called Jo Ann on her cell phone.    Jo Ann told Cano that she was at the mall with someone named "Polo," and that she would call her back later.    Jo Ann called Cano again that afternoon around five o'clock and told Cano that she was going to Raymondville.    Cano never heard from Jo Ann again.

Mares testified that he was informed on November 17, 2003 that Solis had located Jo Ann in Harlingen.    After learning this, Mares picked up Bernardo "Bernie" Cortez, a Mexican Mafia solider, and Jesus "Cricket" Gonzalez, a prospective member, and drove to Mexican Mafia sergeant Manuel "May" Alonzo Trevino's house in Willacy County. Padilla asked Treviño to pick the site of Jo Ann's murder.    Once Mares arrived at the burial site with Cortez, Gonzalez, and Treviño, the men discovered Solis with Jo Ann in tow.

Mares testified that Jo Ann's feet and hands were duct taped to ensure that she would not escape.    "Here is the bitch that tried to . . . fuck us," Mares recalled Solis telling him at the scene.    Then, Solis hit Jo Ann on the left side of her face, under her eye, with a .40 caliber pistol.    Mares recalled that Jo Ann's face started to bleed, and she fell to the ground.    On the floor, Jo Ann began to cry and pleaded with Solis. Mares recalled Jo Ann telling Solis, "Please don't kill me.    Don't kill me.    Do it for my little girls."    At that point, Solis began to beat Jo Ann, while Gonzalez joined him. According to Mares, Gonzalez stomped on Jo Ann's head, while Solis hit her with his .40 caliber pistol.    Mares testified that one of Solis's attempts to hit Jo Ann accidentally struck the body of Solis's car, instead.    At that point, Solis dragged Jo Ann to the front of car, got on top of her, and began to strangle her with his bare hands.    As Jo Ann resisted, Gonzalez held her legs down.    Once she died, the team dug a hole and buried

6

her body.  After the burial, Mares stated that they drove to Treviño's house to wash the mud off of their clothes and shoes and drove back to Salazar's house in Alamo to relay the message that the "*camello*" had been fulfilled.  Salazar testified that Solis reported to him that Jo Ann was murdered, and Salazar then notified Padilla.  At that point, Padilla cleared Solis's debt to him.  Before everyone went home that night, the gang drank beer at Salazar's home.

Mares testified that Solis and Gonzalez returned to Jo Ann's grave the following day because Jo Ann's body had floated to the surface due to heavy rainfall from the night before.  To prevent this from reoccurring, Mares stated that Solis and Gonzalez placed heavy bricks and stepping stones on top of her body.[3]

### C.    Investigation into Jo Ann's Disappearance and Death

Harlingen Police Officer Alfredo Alvear initially investigated Jo Ann's disappearance in November 2003 with the assistance of Texas Department of Public Safety Ranger Victor Escalon.  According to Officer Alvear, tips lead him to Ortega, who was Solis's girlfriend at the time.  Ortega and Solis were uncooperative with the investigation, so the case went cold.  A break in the case came in 2005, when Mares cooperated with investigators.  Mares, who was incarcerated at the time in Huntsville, Texas was flown to Harlingen to assist investigators in finding Jo Ann's body.  Ranger Escalon testified that Mares took investigators to Raymondville, Texas where Treviño lived, and then to a remote field.  According to Ranger Escalon, Mares pointed out a "circular crack in the ground" that was oval-shaped and looked sunken.  Because it was

---

[3] The State called Solis to testify at trial, but Solis invoked his Fifth Amendment right against self-incrimination.  The trial court held him in contempt of court because the State granted Solis use immunity.  We discuss this issue further in Part IV of this opinion.

dusky when the discovery was made, investigators opted to secure the area and return the next morning to begin digging. Ranger Escalon testified that Mares did not attend the next day's excavation.

After the dig commenced, investigators discovered four red circular stepping stones on top of skeletal remains, two or three feet into the ground. Ranger Escalon testified that the discovery of the stones and bones corroborated what Mares told investigators. Ranger Escalon observed that remnants of clothes were also found in the grave, including the victim's undergarments.

Former Cameron County Forensic Pathologist Dr. Marguerite V. DeWitt assisted investigators at the scene with the collection of the bones. The unidentified remains were bagged and taken to Valley Baptist Medical Center in Harlingen for further examination by Dr. DeWitt. Dr. DeWitt eventually performed an autopsy of the remains and noted that the bones indicated that the remains were that of a female's and revealed fractures to: (1) the right side of the face, including the eye rim; (2) cheekbone and upper left jaw; (3) the hyoid bone in the neck; and (4) several ribs. According to Dr. DeWitt, the victim died as a result of homicidal violence with evidence of blunt force trauma to the head, neck, and chest.

Federal Bureau of Investigation forensic examiner John E.B. Stewart assisted with the DNA identification of the remains. According to Stewart, he compared a DNA profile from the skeletal remains alongside DNA from a buccal swab that belonged to Maria Castañeda, Jo Ann's mother. Stewart testified that the DNA profiles matched and that such a match would appear in less than one percent of the Hispanic population.

8

During his later investigation, Ranger Escalon located the vehicle that Solis drove on the date of Jo Ann's disappearance, and photographed and took an imprint of a dent on the passenger side of the vehicle that was consistent with Mares's pistol-whipping story.

Former Mexican Mafia member turned government informant, Paul Ramirez, also testified. The record indicates that Ramirez was not involved with Jo Ann's murder, but was an acquaintance of Padilla's in 2005. Ramirez also knew Padilla's lieutenant, Salazar, but did not know Solis. According to Ramirez, Padilla told him that he was having issues with Jo Ann dating a Drug Enforcement Agency agent in Ohio. Ramirez further testified that he learned through his discussions with Padilla that Padilla had ordered Salazar, not Solis, to murder Jo Ann. Ramirez contended, however, that Padilla later back-tracked his story and denied it.

### D.        Padilla's Indictment and Trial

In 2010, a Willacy County grand jury indicted Padilla for one count of capital murder, a capital felony, *see* TEX. PENAL CODE ANN. § 19.03 (West 2011), related to Padilla's alleged murder-for-hire plot with Solis; and one count of engaging in organized criminal activity. *See id.* § 71.02. For security purposes, the trial court granted the State's motion to change venue from Willacy County to Cameron County. After the venue change, the State expressed its intent to seek the death penalty against Padilla. Before trial, Padilla filed three motions challenging the constitutionality of the death penalty, which were all denied by the trial court.

After a two-week trial, the jury returned a guilty verdict as to Count I for the lesser-included offense of murder, a first-degree felony, *see id.* § 19.02(b), and guilty as

9

charged as to Count II, engaging in organized criminal activity. As a result, the State abandoned its intent to seek the death penalty and, instead, sought life imprisonment for both charges. During the punishment phase, the jury assessed Padilla's punishment at: fifty years' imprisonment at the Texas Department of Criminal Justice—Institutional Division for Count I; and thirty years' imprisonment for Count II. The trial court further ordered that Padilla's sentences be served consecutively with the federal prison sentence that he was serving at the time of trial. This appeal followed.

## II. ACCOMPLICE WITNESS & JAILHOUSE INFORMANT RULES

By his first issue, Padilla contends that the State's accomplice-witness testimony lacks corroboration by other evidence that tended to connect Padilla to Jo Ann's murder. By his fifth issue, Padilla asserts that the State's jailhouse informant witness's testimony lacks corroboration. We will address issues one and five jointly because both challenge the sufficiency of the evidence under identical "tends-to-connect" standards. *See* TEX. R. APP. P. 47.1.

### A. Applicable Laws and Standards of Review

### 1. Accomplice Witness Rule

Article 38.14 of the Texas Code of Criminal Procedure provides that:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

TEX. CODE CRIM. PROC. ANN. art. 38.14.

When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we eliminate from consideration the evidence of the accomplice witness and then examine the testimony of other witnesses to ascertain whether the inculpatory evidence

10

tends to connect the accused to the commission of the crime.   *See Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Brown v. State*, 672 S.W.2d 487, 488 (Tex. Crim. App. 1984).   In our review, all facts and circumstances in evidence may be looked to for corroboration, and the evidence may be circumstantial or direct.   *See Brown*, 672 S.W.2d at 488.

To meet the requirements of the rule, the corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself.   *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).   The non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense.   *Smith*, 332 S.W.3d at 442 (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009)).   There is no set amount of non-accomplice corroboration evidence that is required for sufficiency purposes because each case must be judged on its own facts.   *See Malone*, 253 S.W.3d at 257.   The tends-to-connect standard presents a low hurdle for the State.   *Patterson v. State*, 204 S.W.3d 852, 859 (Tex. App.—Corpus Christi 2006, pet. ref'd) (citing *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996)).   The Texas Court of Criminal Appeals has observed that even apparently insignificant incriminating circumstances may sometimes be satisfactory evidence of corroboration.   *See Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999) (en banc).

### 2.  Jailhouse Informant Rule

Article 38.075 states:

(a) A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the

testimony is corroborated by other evidence tending to connect the defendant with the offense committed. In this subsection, "correctional facility" has the meaning assigned by Section 1.07, Penal Code.

(b) Corroboration is not sufficient for the purposes of this article if the corroboration only shows that the offense was committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075.

The law applying to cases involving corroboration of accomplice witness testimony also applies to cases involving corroboration of jailhouse informants. *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd); *Ruiz v. State*, 358 S.W.3d 676, 680 (Tex. App.—Corpus Christi 2011, no pet.).

**B. Discussion**

**1. Statuses of Accomplices**

In his first issue, Padilla argues that the State's witnesses who implicated him in Jo Ann's murder—namely, Luis Carlos "Wicho" Mares, Oscar Esteban Salazar, Angelita "Angie" Ontiveros and Sara Almaguer Ortega—are all accomplice witnesses by law or fact, thus leaving the record void of any evidence which tends to connect him to crime. We disagree as to Ontiveros and Ortega.

As a threshold matter, we must first determine whether the witnesses at issue were accomplices. An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state. *Smith*, 332 S.W.3d at 439. The State's witness may be an accomplice as a matter of law or as a matter of fact. *Id.* An accomplice as a matter of law is a witness who has been, or could have been indicted for the same offense or a lesser-included offense as the accused. *See id.*; *Cocke v. State*, 201 S.W.3d 744, 747–48 (Tex. Crim. App. 2006). If the parties present conflicting or unclear evidence as to whether a witness is an accomplice, the jury

12

must first determine whether the witness is an accomplice as a matter of fact. *See Cocke*, 201 S.W.3d at 748. In the end, the evidence in each case will dictate whether an accomplice as a matter of law or fact instruction is required. *Smith*, 332 S.W.3d at 439.

The State concedes in this case that Mares and Salazar[4] were accomplice witnesses as a matter of law, but it disputes that Ontiveros and Ortega were accomplices in any form. After reviewing the record, we agree with the State.

First, Padilla's argument that Ontiveros was an accomplice either as a matter of law or fact because she "cooperated with the murders by providing them pictures of her sister" is unpersuasive. It is undisputed that Ontiveros had photos of her sister Jo Ann prior to her murder, and either showed them to, or had them taken away from her, by Padilla and his associates. This fact alone, however, does not rise to a level of participation in the murder with the requisite mental state to make her an accomplice. *See Cocke*, 201 S.W.3d at 748. Furthermore, we disagree that the act of providing Jo Ann's photo is an affirmative act that promoted the commission of the murder because, as the State points out, the individuals involved knew what Jo Ann looked like without the necessity of a photograph. The record also indicates that Ontiveros grew worried for Jo Ann and had warned her to stay away from Padilla and his associates because they were talking negatively about her. Finally, we note that Ontiveros was not indicted for the same offense or a lesser-included offense as Padilla to make her an accomplice as a matter of law. *See Smith*, 332 S.W.3d at 439.

We also find Padilla's argument that Ortega was an accomplice either as a matter

---

[4] The trial court provided the jury with an accomplice-witness instruction with regard to Mares and Salazar's testimonies. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

of law or fact because she "arranged the digging of [Jo Ann's] grave and effected the skills to get it done" unpersuasive because no evidentiary basis supports this argument. Instead, the relevant portions of the record show that Ortega: (1) arranged to pick up Solis from the airport in Harlingen; (2) allowed Solis to drive the Toyota Camry while she attended classes; (3) spent time with Solis in a Harlingen-area hotel room; and (4) dropped Solis off at airport so that he could return to Ohio. None of these facts show a level of participation on her behalf in the murder with the requisite mental state. *See Cocke*, 201 S.W.3d at 748. Additionally, like Ontiveros, Ortega was not indicted for the same offense or lesser-included offense as Padilla to make her an accomplice as a matter of law. *See Smith*, 332 S.W.3d at 439.

Therefore, because we conclude that neither Ontiveros nor Ortega were accomplices to Jo Ann's murder, we proceed with our analysis to determine the sufficiency of non-accomplice evidence under the accomplice-witness rule.

### 2. Jailhouse Informant Status

The State elicited inculpatory testimony from Padilla's one-time "jailhouse lawyer," Mohamed Bandjan.[5] Padilla and Bandjan were incarcerated together in Columbus, Ohio from 2005 to 2006. At that time, Bandjan aided Padilla with legal work related to the present case. In his testimony, Bandjan implicated Padilla as the one who ordered Jo Ann's murder. The State does not dispute Bandjan's status as a jailhouse informant, thus triggering the requirements of article 38.075. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075.

---

[5] Bandjan is not a licensed attorney. Instead, he self-identified as a "jailhouse lawyer" because while incarcerated, he read legal books and helped fellow inmates with legal issues.

14

### 3. Sufficiency of Tends-to-Connect Evidence

After eliminating Mares, Salazar, and Bandjan's respective accomplice and jailhouse informant testimonies from our consideration, *see Brown*, 672 S.W.2d at 488, we conclude that rational jurors could have found that sufficient corroborating evidence tended to connect Padilla to Jo Ann's murder. The jury could have concluded the following:

First, we note that at least three witnesses testified that Padilla and Jo Ann knew each other from Jo Ann's associations with the Mexican Mafia in the Rio Grande Valley and Ohio. Next, the State argues, and we agree, that rational jurors could have concluded that the evidence shows Padilla had a motive to murder Jo Ann built upon his anger at her. The record indicates that (1) Padilla expressed concerns about Jo Ann to Graciano "J.R." Castañeda regarding Jo Ann speaking to a Texas Department of Public Safety trooper; (2) Ontiveros overheard Padilla and his fellow Mexican Mafia associates say[6] that Jo Ann was "fucking up" or that she "fucked up," and "something had to be done;" and (3) Jo Ann's former boyfriend in Ohio, Joseph Taylor "J.T." Walburn testified that Padilla sent Salazar to Ohio after an outburst by Jo Ann at a party, to retrieve Jo Ann and return her to the Valley. While evidence of motive is a consideration in our sufficiency review which may corroborate accomplice-witness and jailhouse-informant testimony, it is insufficient on its own. *See Smith,* 332 S.W.3d at 442. Thus, we turn to other evidence.

Ontiveros and J.R. Castañeda both testified that Padilla had shown Solis photos of Jo Ann prior to her disappearance and murder. Ontiveros testified that she

---

[6] Ontiveros could not identify exactly who made the statement.

overheard an unknown individual say during a meeting between Padilla, Salazar, and Solis that Jo Ann was either "fucking up" or that she "fucked up," and that "something had to be done." According to Ontiveros, she took the comments seriously and told Jo Ann to stay clear of Padilla and his associates. Ontiveros also stated that Padilla was an individual who gave orders to Salazar and Solis, and not the other way around. Former Mexican Mafia member Ramirez also testified that he learned that Padilla had ordered Jo Ann murdered, but he testified that Padilla ordered Salazar to kill Jo Ann, rather than Solis. This evidence directly conflicts with the accomplice-witness testimony that Padilla ordered Solis to murder Jo Ann, but it still tends to connect Padilla to the offenses. Moreover, when conflicting views of the evidence exist in our sufficiency review of non-accomplice evidence, we will defer to the jury's resolution of the evidence. *See id.* ("[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence."). Furthermore, this evidence does not conflict with other evidence that Padilla, nonetheless, ordered Jo Ann's murder.

Finally, other suspicious circumstances also tend to connect Padilla to Jo Ann's murder. Eduardo Villanueva, one of Padilla's fellow prisoners at the Cameron County jail, testified that Padilla had sent him a letter asking him to testify that Mares lied about Padilla's involvement in Jo Ann's murder. In the letter, Padilla wrote that if he helped out Padilla, God would "bless" Villanueva. Villanueva testified that he understood Padilla's reference to God to mean Padilla would pay him money for perjured testimony. Lastly, Jo Ann's former boyfriend in Ohio, J.T. Walburn, also testified that around the time Jo Ann was reported missing, Padilla called him twice, "back-to-back," to ask him if he knew where Jo Ann was because she was "missing." Walburn and Padilla knew

16

each other from previous drug-trafficking activities. Walburn testified that Padilla called him two hours later for a third time to ask him the same question about Jo Ann. Walburn testified that he thought the calls were "suspicious" and "way out of character" for Padilla.

In light of the record under the proper standards of review, we conclude that sufficient corroboration testimony tends to connect Padilla to Jo Ann's murder to satisfy articles 38.14 and 38.075. *See* TEX CODE CRIM. PROC. ANN. arts. 38.14, 38.075. Padilla's first and fifth issues are overruled.

### III. CONSTITUTIONALITY OF CAPITAL PUNISHMENT PROCEDURE STATUTE

By his second issue, Padilla challenges the constitutionality of the statutorily-mandated procedures in capital death-penalty cases because the gatekeeping functions of mitigation are improperly delegated to the judiciary under article 37.071 section 2(a) of the Texas Code of Criminal Procedure. *See id.* 37.071 § 2(a).

The Texas Constitution vests judicial power over criminal cases in the Court of Criminal Appeals and in the courts of appeals. TEX. CONST. art. V, §§ 1, 5; *see Gonzales v. State*, 864 S.W.2d 522, 523 (Tex. Crim. App. 1993) (en banc) (Baird, J. concurring); *Dix v. State*, 289 S.W.3d 333, 334 (Tex. App.—Eastland 2009, pet. ref'd). "Judicial power" is the power of the court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for a decision. *Dix*, 289 S.W.3d at 335 (citing *Morrow v. Corbin*, 62 S.W.2d 641, 644 (Tex. 1933)).

Texas courts are without authority to render advisory opinions. *See Armstrong v. State*, 805 S.W.2d 791, 794 (Tex. Crim. App. 1991) (en banc); *State v. Mercier*, 164 S.W.3d 799, 811–12 (Tex. App.—Corpus Christi 2005, pet. ref'd).

17

The Texas Rules of Appellate Procedure require us to address every issue raised and necessary to final disposition of the appeal. TEX. R. APP. P. 47.1. To decide an issue that is unnecessary to the disposition of a case is advisory in nature, and thus, outside the scope of our power and authority. *See Dix*, 289 S.W.3d at 335 (citing *Hargrove v. State*, 774 S.W.2d 771, 772 (Tex. App.—Corpus Christi 1989, writ ref'd)).

Padilla was charged with capital murder, *see* TEX. PENAL CODE ANN. § 19.03, but the jury found him guilty of the lesser-included offense of murder. *See id.* § 19.02(b). Thus, the procedures delineated in article 37.071 for capital offenses were rendered inapplicable to Padilla during the punishment stage of his trial. Accordingly, we decline to entertain Padilla's invitation to address this issue because to do so would amount to an unauthorized advisory opinion. *See* TEX. R. APP. P. 47.1; *Dix*, 289 S.W.3d at 335. Padilla's second issue is overruled.

## IV. CALLING SOLIS AS A WITNESS

By his third issue, Padilla asserts that the trial court committed reversible error by allowing the State to call Solis to testify in the presence of the jury knowing that he would invoke his Fifth Amendment right against self-incrimination.

### A. Standard of Review and Applicable Law

As a starting point, an accused has a right to confront and cross-examine the witnesses against him. *See* U.S. CONST. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403–04 (1965); *accord Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010). The Fifth Amendment of the United States Constitution also provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. To seek its protection in a criminal case, one must affirmatively

18

assert the privilege. *See Johnson v. State*, 357 S.W.3d 653, 657 (Tex. Crim. App. 2012).

The right to be free from comment about a failure to testify, however, is not absolute. *See United States v. Robinson*, 485 U.S. 25, 31–32 (1988) (holding that any "direct" reference by a prosecutor's comments to the failure of a defendant to testify is too broad a reading of the Fifth Amendment and, instead, must be read in the context). An exception to the general prohibition against allowing the jury to see a witness's invocation of a Fifth Amendment privilege arises in certain instances where the State calls a witness who refuses to testify. *Coffey v. State*, 796 S.W.2d 175, 178 (Tex. Crim. App. 1990) (en banc). Under this exception, the State may call such a witness when "the prosecutor's case would be seriously prejudiced by a failure to offer him as a witness." *Id.* (quoting *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980)).

Moreover, the Court of Criminal Appeals held that a co-defendant witness who had been granted use immunity for her testimony "did not have a valid basis for refusing to testify." *Coffey*, 796 S.W.2d at 179. The *Coffey* Court cautioned, however, that even though calling a co-defendant witness who had been granted use immunity for testimony was constitutionally permissible, the State may nonetheless unfairly prejudice a defendant "in a variety of ways,"—for example, "had the State asked the witness a series of damaging questions in such a way as to invite the jury to assume that the answers to each question would have been in the affirmative." *Id.* at 179, n. 6.

**B. Discussion**

In this case, the State called Solis to testify. Prior to trial, Solis pleaded guilty to the lesser-included offense of murdering Jo Ann and was sentenced to thirty-five years in

prison. The record indicates that the trial court made a prior ruling that Solis did not have a Fifth Amendment right against self-incrimination by virtue of the use immunity granted to him. The trial court also limited the scope of the questions that the State could ask Solis. Padilla's counsel fervently objected to the State calling—and the trial court allowing—Solis to testify in the jury's presence on grounds that doing so would violate Padilla's Sixth Amendment right to confront witnesses against him because the State was aware that Solis would exercise his Fifth Amendment right against self-incrimination. An extensive hearing was held on the matter, outside the presence of the jury, wherein Solis's counsel made the following relevant statement to the trial court:

[SOLIS'S COUNSEL]: Judge, my client is aware that the court has ruled that he has no Fifth Amendment right to remain silent. My client is aware that the State has offered state immunity. However, my client is putting those aside and his concern is focused on federal prosecution.[7]

The trial court noted Solis's objection, affirmed that Solis did not have a Fifth Amendment right in this case, and ordered him to testify. During trial, the following exchange took place in the presence of the jury:

[PROSECUTOR]: Your Honor, the State of Texas calls to the stand Marcos Illan Solis.

[DEFENSE COUNSEL]: Your Honor, the defendant, based upon the hearing held outside the presence of the jury, would enter an objection which mirrors those objections made outside the presence of the jury [ . . . .]

_____

[7] The record contains a letter from the United States Attorney for the Western District of Michigan, Charles R. Gross, which advises the State that Solis was the target of a "multi-defendant cocaine conspiracy" case conducted by his office. The letter notes that the U.S. government would "forego indictment" of Solis, if Solis is "convicted of a homicide offense and serves a substantial prison sentence of at least twenty-five years in Texas." After consideration, the trial court deemed this letter as additional immunity from the federal government.

20

[TRIAL COURT]:          My ruling stays the same.   Denied.

After taking the stand, Solis orally invoked his Fifth Amendment right, and advised the trial court that he would not answer any questions and would remain silent.   The trial court advised Solis that he would be held in contempt and asked Solis's counsel to advise him of the same.   The trial court held Solis in contempt for 180 days to run consecutive to his current sentence for the murder.

At this point, the State proceeded by asking the following questions, over Padilla's objections:

| | |
|---|---|
| [PROSECUTOR]: | Is your name Marcos Illan Solis? |
| [SOLIS]: | [No response]. |
| [PROSECUTOR]: | Are you the same Marcos Illan Solis that is a member of the Mexican Mafia? |
| [SOLIS]: | [No response]. |
| [PROSECUTOR]: | And that was a solider under the reign of Captain Willie Padilla of the Mexican Mafia of the Rio Grande Valley? |
| [DEFENSE COUNSEL]: | Objection, Your Honor.  May I have, please, a running objection to each question that is being asked that involves—And it's a multi-phased objection, so let me make a series of objections, and I ask that they run with each question. |
| [TRIAL COURT]: | No.  You object each time.  I'm not going to give you a running one. |
| [DEFENSE COUNSEL]: | Okay.  Then, Your Honor, I'm going to object again. This question leads into areas that violate the defendant's Sixth Amendment right to cross-examine him.  Not only that, the—this witness was called by the State and he's now leading his witness and testifying on behalf of the witness, Your Honor. |

| [PROSECUTOR]: | I didn't think I would have to ask this, but permission to treat this witness as a hostile witness, Your Honor. |
|---|---|
| [TRIAL COURT]: | He is hostile and he will be treated as a hostile witness. |

At this point in the proceeding, the State discontinued questioning Solis and the trial court again held him in contempt of court.

Later, outside the presence of the jury, Padilla moved for a mistrial on grounds that the State proceeded to call Solis knowing that he would invoke his Fifth Amendment privilege; that the trial court improperly permitted Solis to invoke his Fifth Amendment right in front of the jury; and the State's calling of Solis in front of the jury put Padilla in an unfair and prejudicial position. The trial court denied the motion for mistrial.

We now turn to the Padilla's issue on appeal. Our first inquiry is whether the trial court erred by allowing the State to call Solis as a witness. The record is clear that Solis was a co-defendant who had been granted use immunity for his testimony by the State. The trial court recognized Solis's immunity by not allowing him to invoke the Fifth Amendment. A co-defendant witness who has been granted use immunity for his testimony does not have a valid basis for refusing to testify. *See id.* at 179. In this situation, Solis could have refused to testify only "on peril of contempt." *See id.* at 178 (quoting *United States v. Beechum*, 582 F.2d 898, 909 (5th Cir. 1978)). Accordingly, we conclude that the trial court did not err by concluding that Solis did not have a Fifth Amendment privilege against self-incrimination to invoke and ordering him in contempt for not testifying.

Although calling Solis to testify is "constitutionally permissible" in this case, *see id.*, we will nonetheless examine whether the State's questioning "unfairly prejudiced"

Padilla.[8]   *See id.* at 179 n. 6.   The trial court allowed the State to ask three questions of the witness: (1) "Is your name Marcos Illan Solis?" (2) "Are you the same Marcos Illan Solis that is a member of the Mexican Mafia?" and (3) "[. . . T]hat was a solider under the reign of Captain Willie Padilla of the Mexican Mafia of the Rio Grande Valley?"   Under *Coffey*, we conclude that the State's first and second questions were not prejudicial because they merely asked Solis to confirm his identity and that he was a member of the Mexican Mafia.   However, we conclude that the third question was not proper because it was phrased and characterized in such a way to invite the jury to assume that the answer would have been in the affirmative and prejudice the defendant.   Nevertheless, we conclude that such error was harmless because the substance of the question asked and expected answer involved an issue which other witnesses testified to, without objection, about Solis and Padilla's respective ranks in the Mexican Mafia.   *See* TEX. R. APP. P. 44.2.   Accordingly, we overrule Padilla's third issue.

## V.   CONFIDENTIAL INFORMANT RULE

By his fourth issue, Padilla contends that testimony from witness Paul Ramirez, required corroboration under article 38.141 of the code of criminal procedure.   *See* TEX. CODE CRIM. PROC. ANN. art. 38.141.

The relevant portion of Article 38.141 provides the following:

A defendant may not be convicted of an offense *under Chapter 481, Health and Safety Code*, on the testimony of a person who is not a licensed peace officer or a special investigator but who is acting covertly on behalf of a law enforcement agency or under the color of law enforcement unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

---

[8] Although the *Coffey* Court did not engage in this analysis because the defendant did not raise it, we will do so today in light of Padilla's objections to the trial court and subsequent motion for mistrial regarding the State's questioning of Solis.

*id.* art. 38.141(a) (emphasis added). The record is clear that Padilla was convicted of the lesser-included offense of murder, *see* TEX. PENAL CODE ANN. § 19.02(b), and engaging in organized criminal activity. *See id.* § 71.02. Neither of these offenses falls within the ambit of chapter 481 of the health and safety code to make article 38.141 applicable. Accordingly, we overrule Padilla's fourth issue.

## VI. CONCLUSION

We affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
24th day of October, 2013.

24